UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PROMEDICA NORTH REGION, INC.,

        Plaintiff,
   Counter-defendant,

vs.

Case No. 08-CV-12812

HON. GEORGE CARAM STEEH

MICHIGAN NURSES ASSOCIATION,

        Defendant,
   Counter-plaintiff.
_____/

## ORDER DENYING PLAINTIFF'S MOTION TO VACATE ARBITRATION AWARD AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This labor case arises from a grievance filed by the Michigan Nurses Association (MNA), against its employer, ProMedica North Region, Inc. (PNR). MNA's grievance challenged PNR's unilateral implementation of a change in its paid leave policy by which it reduced the amount an employee could claim for cashing-out paid leave by ten percent, allegedly to comply with federal tax laws. PNR seeks to vacate the arbitration award. MNA filed a counterclaim to uphold the award and has filed a motion for summary judgment. For the reasons set forth below, the arbitrator's award shall be upheld.

## BACKGROUND

PNR is a health care delivery system located in Lenawee County, Michigan. PNR (formerly known as Lenawee Health Alliance) is a regional affiliate of ProMedica Health System, Inc. (PHS), the parent corporation to 72 corporations located in Ohio

and Michigan with about 16,000 employees.  PNR has two acute care facilities, one in Tecumseh, Michigan, known as Herrick Memorial Hospital (Herrick), the other in Adrian, Michigan, known as Bixby Medical Center (Bixby).  MNA represents 200 registered nurses at the Herrick and Bixby facilities.  The RNs at both facilities have a single collective bargaining agreement (CBA) with PNR.  MNA's CBA with PNR is in effect from July 1, 2006 to June 30, 2009.  (Doc. 3, Exhibit B).

PNR and MNA have a long standing collective bargaining relationship.  The parties have always included provisions in their CBA governing paid leave time.  The accrual system is based on years of service, hire date, and hours worked each week.  (Doc. 13, Exhibit A at 21).   Under Article 20, Section 2, a nurse may accrue up to .15 hours of paid leave for each hour worked.  Id.  This accrued leave can accumulate up to 39 eight-hour days per year.  Id.  As paid leave is accrued, it is accumulated in a "bank" for the nurse to use or cash out in accordance with certain conditions listed in Section 20.3 of the CBA.  (Doc. 13, Exhibit A at 21-22).  A nurse may also cash out paid leave on a holiday under Section 21.0 of the CBA, in an amount equal to the number of hours she worked on a holiday.  (Doc. 3, Exhibit A at 22-23).

The relevant provisions of the CBA regarding paid leave are set forth below:

Section 1.0 Collective Bargaining Unit
Pursuant to and in accordance with all applicable provisions of the
National Labor Relations Act, as amended, the Employer does hereby
recognize the Association as the exclusive representative for the purpose
of collective bargaining in respect to rates of pay, wages, hours of
employment, or other terms and conditions of employment, for the term of
this Agreement, of all service providers of the Employer who are in the
bargaining unit described as follows:

PAID LEAVE

Section 20.0 Eligibility for Paid Leave
All full-time and part-time nurses in budgeted positions of at least thirty-two (32) hours per pay period shall receive paid leave on a pro-rated basis.

Section 20.1 Included in Paid Leave
Benefits formerly known as sick days, vacation days, personal days and holidays are included.

. . .

Section 20.3 Paid Leave Administration

Paid leave may be used for vacation, sickness, holidays, personal or other reasons subject to the following:

f. The employer will continue granting pay for PL in lieu of time off for:
   1. full-time nurses, provided that the nurse has requested PL and it has been denied.
   2. nurses who request paid leave equal to one regular shift (not to exceed twelve (12) hours) each pay period.
   3. by mutual agreement of the nurse and the Employer, provided that payments affecting a group of individuals represented by the Association may be made only by mutual agreement of the Employer and the Association.

HOLIDAYS

Section 21.0 Holidays
c. If a nurse works on any of the recognized holidays s/he will be paid time and one-half (1 1/2) as a premium for working on the actual holiday. In addition, a nurse who works on a recognized holiday has the option of requesting an equivalent number of hours to be paid from his/her Paid Leave bank.


Prior to December 31, 2006, when an employee used paid leave, or cashed-out such credits instead of using it, income tax was withheld at that time. If the paid leave days were neither used nor cashed-out, no income taxes were withheld from the

3

employee's compensation.  In other words, taxes were not withheld as employees earned paid leave, only as they used paid leave.

PNR's parent, PHS, uses the services of Deloitte Tax, LLP for tax advice on system-wide payroll issues.  In January, 2006, during a routine audit, one of PHS's auditors, Jeffrey Frank, came across a form which was used for paid leave cash-outs.  He opined that there was possible "constructive receipt" of income as a taxable event arising when an individual was actually credited with the paid time off, rather than upon subsequent use or cash-out.  According to PNR, IRS regulations provide that, if income is set aside so that an employee can take such income if the employee wants it, then that income is considered constructively received - and therefore taxable - at the time of the award, unless the compensation is subject to some type of "substantial limitation."  Its tax advisors told PNR that this could be a "constructive receipt" situation.  PNR explored the issue throughout 2006 but did not discuss the issue with MNA during their contract negotiations.  PNR and MNA reached a tentative agreement in September, 2006 and a final agreement was ratified in October, 2006.

As of January 1, 2007, PNR implemented a 10 percent penalty on all cash-outs for paid leave time for all of its employees, including all nurses at its Bixby and Herrick facilities.  On January 3, 2007, PNR Vice President of Human Resources Dennis Wright distributed a memorandum to all employees in the MNA bargaining unit about the change of the CBA's cash-out provisions.  (Doc. 3, Exhibit E).  That memo clarified that the 10-percent penalty would also apply to the value of paid time-off donated to a charitable organization.   Id.  This decision came after nearly one-year of an internal review of the perceived tax problem on the part of the employer.  At no time, did the

4

employer discuss this change with the union. As discussed earlier, the impetus for the 10-percent penalty policy was the internal audit performed by Frank.

PNR adopted the 10-percent penalty policy based on its interpretation of the Tax Code and an advisory letter issued by the IRS in 1989, in another case not involving these parties. The employer never sought an advisory letter to address its own situation. PNR decided that to avoid the potential of paid leave bringing about an immediate taxable event, it would impose a "substantial limitation" on the future use or cash-out. The employer determined that a 10 percent reduction in the value of cashed-out credits would constitute a "substantial limitation." It is unclear exactly how the 10 percent figure was reached, but it appears to have been based on other instances of imposition of a penalty, as for example in the case of an early withdrawal from an IRA or 401(k) account. The 10-percent penalty was appropriated to the employer's general fund.

On January 12, 2007, the union filed a class action grievance on the basis that the imposition of the 10-percent penalty violated Sections 1, 21.0, and 20.3 (Paid Leave) of the CBA. Six months later, the employer advised the union that the policy would apply equally to credits earned and banked for working on a holiday. On this basis, the union amended its grievance on July 2, 2007, to include a violation of Section 21.0(c) (Holidays) as well. The grievance was submitted to arbitration through the American Arbitration Association and the parties selected William P. Daniel as the Arbitrator.

On December 11, 2007, Arbitrator Daniel conducted a one day hearing in which PNR and MNA presented oral testimony and documentary evidence in support of their

positions. After the hearing, Arbitrator Daniel reviewed post-hearing briefs from both parties. On April 2, 2008, Arbitrator Daniel issued a detailed and well-reasoned 17-page opinion. In that opinion, he determined that the PNR violated all three sections of the CBA in dispute by unilaterally modifying the CBA. He ordered PNR to cease and desist from imposing the 10-percent penalty and make the affected employees whole for their losses.

On July 1, 2008, PNR filed a complaint here, invoking § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, seeking to vacate the award. PNR argues that Arbitrator Daniel exceeded the scope of his authority because his decision is inconsistent with federal tax law requirements. On July 21, 2008, MNS filed a counterclaim seeking to affirm the award. Now before the Court is PNR's motion to vacate the arbitration award and MNA's motion for summary judgment. For the reasons set forth below, the Arbitrator's decision shall be upheld and MNA's motion for summary judgment shall be granted.

STANDARD OF LAW

This Court's review of an arbitration award is extremely limited. Truck Drivers Local No. 164 v. Allied Waste Sys., Inc., 512 F.3d 211, 216 (6th Cir. 2008). The Sixth Circuit has explained that in light of federal policy in favor of arbitration, "a court's review of an arbitrator's decision is very narrow; 'one of the narrowest standards of judicial review in all of American Jurisprudence.'" Int'l Ass'n of Machinists & Aerospace Workers v. Tenn. Valley Auth., 155 F.2d 767, 771 (6th Cir. 1998) (quoting Lattimr-Stevens v. United Steelworkers, 913 F.3d 1166, 1169 (6th Cir. 1990)). "As long as the arbitrator's award draws its essence from the collective bargaining agreement, and is not merely

his own brand of industrial justice, the award is legitimate." United Paperworkers Int'l Union v. Misco, 484 U.S. 29, 36 (1987) (quotations omitted). The standard of review of an arbitrator's decision is so liberal, that the Supreme Court has held, "if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) (quotations and citations omitted).

The Sixth Circuit recently set forth a new three-part test for reviewing a final and binding arbitration award. Michigan Family Resources v. Service Employees Int'l Union Local 517 M, 475 F.3d 746, 753 (6th Cir.) (en banc), cert. denied, ___ U.S. ___, 127 S. Ct. 2996 (2007). The new standard requires the district court to consider three questions:

> (1) Did the arbitrator act "outside his authority" by resolving a dispute not committed to arbitration;
>
> (2) Did the arbitrator commit fraud, have a conflict of interest, or otherwise act dishonestly in issuing the award; and
>
> (3) In resolving any legal or factual disputes in the case, was the arbitrator "arguably construing or applying the contract"?

Id.[1] The Sixth Circuit explained that so long as an arbitrator does not offend any of

---

[1] Prior to Michigan Family Resources, the Sixth Circuit applied the four-factor test outlined in Cement Divisions Nat'l Gypsym Co. v. United Steelworkers of America, AFL-CIO-CLC, Local 135, 793 F.2d 759, 766 (6th Cir. 1986). Michigan Family Resources expressly overruled the Cement Divisions four-part test. 475 F.3d at 746. To the extent that PNR seeks to rely on Cement Divisions, that reliance is misplaced. The Sixth Circuit recently explained that Cement Divisions allowed district courts more latitude in reviewing arbitration awards than the Supreme Court's recent decisions permit. Michigan Family Resources, 475 F.3d at 751 (citing United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29 (1987); Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504

7

these factors, "judicial intervention should be resisted even though the arbitrator made 'serious,' 'improvident,' or 'silly' errors in resolving the merits of the dispute." Id. Under the onerous three-pronged test, only the most egregious awards may be vacated. Id. In fleshing out what the term "arguably construing" means, the Sixth Circuit explained that it requires only that "the arbitrator appeared to be engaged in interpretation" and that "consideration of the merits of a dispute is the rare exception, not the rule." Id. In Michigan Family Resources, the Sixth Circuit refused to vacate the arbitration award, despite its finding that the arbitrator made a legal error, because it was an error of interpretation of the contract. Id. at 756. The Sixth Circuit explained that the parties bargained for an arbitrator's construction and that bargain "must be respected even when time and further review show that the parties in the end have bargained for nothing more than error." Id. The three-pronged test established in Michigan Family Resources applies equally to PNR's motion to vacate the arbitration award and to MNA's motion for summary judgment, which in essence, is a motion to affirm the arbitration award.

## ANALYSIS

PNR does not allege that arbitrator William Daniel acted outside his authority by resolving a dispute not committed to arbitration. Further, PNR does not allege that Daniel committed fraud, had a conflict of interest, or otherwise acted dishonestly in issuing the award. The only issue, then, for the Court in deciding PNR's motion to vacate the arbitration award is whether Daniel was "arguably construing" the contract.

---

(2001)).

For the reasons set forth below, the Court finds that he did "arguably construe" the CBA.

PNR argues that Arbitrator Daniel erred by imposing additional requirements on the parties not called for in the CBA. Specifically, PNR complains that Articles 20 and 21 of the CBA provide for cash-out benefits but do not prescribe the rate at which those benefits are to be paid. PNR argues that the Arbitrator erred in considering the past practice of the parties because it was inconsistent with the CBA. This Court disagrees.

Arbitrator Daniel expressly discussed this issue and recognized that he was duty bound not to look to past practice in a manner that would be inconsistent with the CBA. He could only look to past application to the extent that it might flesh out indefinite or inexact contract terms. Abritrator Daniel found that the employer could not rely on the fact that the CBA did not expressly state that an employee could cash-out PL credits at 100 percent value where this conflicted with the admitted past application of the paid leave cash-out provisions. (Doc. 20, Exhibit C at 3, 19). Arbitrator Daniel found that "the past application of the contract provision over a number of contracts reveals that the value of credited or banked accrued leave time has always been calculated in a pay out or use at 100 %." (Doc. 20, Exhibit C at 13). Based on this past application of the paid leave provisions in the CBA, Arbitrator Daniel ruled that "the employer may not rely upon the failure of the contract to specifically designate that as excusing it from such obligation." The Arbitrator acted within his authority to flesh out indefinite terms of the CBA by looking to the past application of the provisions governing paid leave. See Perry v. Million Air, 943 F.2d 616, 619 (6th Cir. 1991) (arbitrator may use past practice and industry custom to interpret collective bargaining agreement).

Secondly, PNR argues that reading the 100 percent payout requirement into the

9

CBA impermissibly narrows PNR's unilateral management rights under Article 2 of the CBA. Article 2 grants the employer broad management rights "so long as they are not inconsistent therewith." Arbitrator Daniel was "arguably construing" the contract when he interpreted the paid leave provisions of the CBA as requiring 100 percent payout for paid leave. His analysis did not conflict with Article 2 as management does not retain the unilateral right to alter the CBA, but only retains the right to act in a manner that is not "inconsistent" with the CBA.

Thirdly, PNR argues that Abitrator Daniel erred because reading the 100 percent payout requirement into the CBA conflicts with federal tax law, thus making the contract illegal and a nullity. PNR argues that the 10 percent limitation is appropriate under the CBA's severability provision, Article 25, Section 14, which provides that "[i]f any part of this Agreement becomes invalid under existing or future laws (either State or Federal), the remainder of this Agreement shall not be affected." PNR argues that the 100 percent payout requirement codifies an "unlawful practice" and contradicts the requirement that a contract is only enforceable to the extent that it is legal.

Arbitrator Daniel rejected these same arguments during the arbitration proceedings. He ruled that PNR failed to show any violation of federal law, and even if it had, the employer had several options for complying with the perceived tax violation, and should have included the union in negotiating a response to the perceived tax violation. As an initial matter, the "constructive receipt" argument arose based on a Private Letter Ruling in another case. PNR never sought nor received a Private Letter Ruling or advisory letter in its own case. Arbitrator Daniel noted that the advisory letter was merely a private advisory which is not binding on other parties. PNR argues that

the Arbitrator's decision should not be upheld because the Arbitrator failed to thoroughly review pertinent provisions of the IRS Code or its regulations. The Arbitrator was not required to issue an advisory opinion on the legality of PNR's chosen tax procedure. PNR was free to seek an advisory letter to clarify its tax obligations but chose not to do so.

PNR spent the better part of a year deciding on how best to respond to the perceived tax violation. During most of that same time period, PNR and MNA negotiated a new CBA. During those CBA negotiations, PNR never proposed any change to the language pertaining to paid time off, accrual or cash-out procedures. PNR never mentioned its ongoing review and consideration of what it perceived to be problems of constructive receipt, the timing of a taxable incident, and compliance with the IRS Code. Arbitrator Daniel found that this suggested there was no "urgency" in responding to the perceived tax violation and no reason for management to act unilaterally in altering the terms of the CBA where it could have and should have included the union in negotiations.

During the better part of the year while the employer sought a solution to the perceived tax violation, the allegedly flawed procedure for cashing out paid leave continued unabated. Arbitrator Daniel found that this course of conduct undermined any sense of urgency which the employer advanced to explain the need for it to act unilaterally. Finally, Arbitrator Daniel noted that the employer had several admitted options for addressing the concern over the alleged tax violation. For example, PHS considered and rejected a policy amendment by which credited monthly days would be taxed when accrued as though received and the employee's taxes would be deducted

from their regular payroll check. Other alternatives were considered such as requiring an automatic cash-out at the end of any year, or when a particular bank balance reached a certain level. At the arbitration hearing, Lori Johnson, Vice President for the Finance System, testified that PNR had other options and legal alternatives to address the perceived constructive receipt problem other than the method adopted. (Doc. 12, Exhibit B at 96-98)[2]. Arbitrator Daniel found that the employer had no good explanation for not involving the union in negotiations for altering the manner in which cash-out payments were made.

Arbitrator Daniel further found that the employer's unilateral action violated the National Labor Relations Act in that it failed to bargain with relation to pay, wages, hours of employment or other terms and conditions of employment. He found that the calculation of paid leave is a mandatory subject of bargaining under the NLRA, and that the unilateral action by either party to remove from a currently effective collective bargaining agreement any portion relating to such term and condition of employment would constitute an unfair labor practice. The employer agreed to be bound by the terms of the NLRA in the recognition clause of the CBA, Article 1 which provides:

> Pursuant to and in accordance with all applicable provisions of the National Labor Relations Act, as amended, the Employer does hereby recognize the Association as the exclusive representative for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, or other terms and conditions of employment.

---

[2]MNA has attached exhibits purporting to show that PNR has repeatedly admitted that the 10 percent penalty was only one of the legal options available to it to address the constructive receipt concern. (Doc. 12, Exhibits G and H). PNR argues that the Court cannot consider Exhibit H because it was part of a settlement offer. PNR argues that the Court cannot consider Exhibit G because it was part of an offer of compromise. The Court has not considered these exhibits in its analysis here.

(Doc.12, Exhibit A at 1). In sum, Arbitrator Daniel ruled that the employer violated the CBA by acting to unilaterally solve an alleged, but unproven, tax violation. He found that the employer failed to prove that the IRS Code invalidated the provision of the contract in regard to use and cash-out of PL days.

PNR argues that Arbitrator Daniel failed to refer to, quote, or analyze the pertinent provisions of the IRS Code or to otherwise indicate that he engaged in a good-faith interpretations of such provisions. Given the facts presented to Arbitrator Daniel, a detailed analysis of federal tax laws was not required. It was undisputed that PNR had solutions to the perceived tax problem available to it other than the imposition of the 10 percent penalty. For example, the paid leave could have been taxed at the time of accrual. PNR has argued that adopting new accounting and payroll procedures would be administratively burdensome, but any such burden is not an excuse to violate the CBA or to refuse to abide by the Arbitrator's award. It is possible that PNR could have negotiated a solution with MNA to avoid the potential tax problem in a manner that would not violate the CBA. In addition, PNR admitted to ambiguity and uncertainty in the law as to its exact tax liability and admitted that the 10 percent penalty amount was adopted in the manner of an educated guess, rather than pursuant to specific statutory reference.

Finally, PNR argues that Arbitrator Daniel's arbitration award is contrary to public policy because it requires PNR to restore policies that have been determined by its tax and legal professionals to be contrary to law. PNR has overstated Arbitrator Daniel's award. He did not determine that PNR should return to a system that violates federal tax laws, or that it was precluded from withholding the necessary taxes. The Award

simply prevents PNR from deducting a 10 percent tax penalty from paid leave cash-outs because such a penalty violates the CBA and to make whole any employees whose compensation has been so reduced. PNR has admitted that the 10 percent penalty was only one of the options for addressing the constructive receipt concern. No well-defined public policy has been violated here. PNR has not shown that the option it selected to address its tax concerns was required by the IRS. Moreover and more importantly, PNR admits that it does not know if the 10 percent penalty even complies with federal tax laws. In the absence of any express statute or law requiring the imposition of a 10 percent penalty, no well-defined or dominant public policy has been violated by the Arbitrator's Award.

PNR cites to W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of America, 461 U.S. 757 (1983) for the proposition that arbitration awards may not be enforced where they would violate public policy. W.R. Grace does not support PNR's position. In that case, the Equal Employment Opportunity Commission (EEOC) found reasonable cause to believe that the employer had discriminated against African Americans and women at its plant and invited the employer to conciliate the dispute, which it did. Id. at 759. The conciliation agreement was entered without the union's participation, and it violated the seniority provisions of the collective bargaining agreement by assigning female strike replacement workers to positions ahead of men with greater seniority. Id. at 759-60. Two men who were laid off under the terms of the conciliation agreement, but in violation of the collective bargaining agreement, filed grievances which were arbitrated. Id. at 762.

14

The employer did not dispute that the lay-offs violated the seniority provisions of the collective bargaining agreement, but argued that the lay-offs should be upheld because they complied with the EEOC conciliation agreement. Id. at 763. The arbitrator ruled in favor of the aggrieved workers on the basis that the employer had violated the collective bargaining agreement. Id. at 763-64. The Supreme Court upheld the arbitrator's decision. Id. at 772. In reaching this decision, the Supreme Court considered whether the collective bargaining agreement was contrary to public policy such that it should not be enforced. Id. at 766. The Court explained that in order for public policy considerations to invalidate a contract, the public policy must be "well defined and dominant." The Court then found no public policy to be invalidated by enforcing the collective bargaining agreement. Id. at 770. The Court explained that the company's dilemma of complying with either Title VII or the collective bargaining agreement and thus, violating the other, was a problem of its own making. Id. at 767-70. The Court noted that although voluntary compliance with Title VII is an important public policy, absent a judicial determination, the company cannot alter the collective bargaining agreement without the union's consent. Id. at 771. The Court recognized the important federal labor policy that parties to a collective bargaining agreement will have reasonable assurances that their contracts will be honored. Id. at 771.

That same public policy is at stake here. Union members have an important interest in having their collective bargaining agreement upheld. Although PNR also has an important public policy interest in complying with federal tax laws, PNR has not shown that this interest required it to act unilaterally, without negotiating with the union, and in violation of the CBA's provisions regarding paid leave. Moreover, PNR has not

15

shown that taxing paid leave under the process set forth in the collective bargaining agreement violated any federal tax laws. While PNR is correct that courts may not enforce collective bargaining agreements that are contrary to public policy, such a policy "must be well defined and dominant." Id. at 766. Having failed to show a well defined tax law that required it to unilaterally breach the collective bargaining agreement, no public policy has been violated here, and Arbitrator Daniel's award should be affirmed.

Looking to Arbitrator Daniel's seventeen-page opinion, it is clear that he was "arguably construing" the CBA. He quoted all of the relevant provisions of the CBA in his opinion and discussed his interpretation of those provisions at length. The award is not contrary to any definitive tax law or public policy; therefore, PNR's motion to vacate the award must be denied.

Finally, MNA argues that it is entitled to costs and attorney fees incurred in bringing this action to enforce an arbitration award. MNA does not cite to any contractual or statutory provision allowing for attorney fees but argues that fees are warranted because PNR's refusal to comply with the arbitration award lacks justification. MNA cites to Local 149 Int'l Union, UAW v. American Brake Shoe Co., 298 F.2d 212, 216 (4th Cir. 1962). In that case, the Court of Appeals ruled that in "an appropriate case attorneys' fees should be awarded against a party who, without justification, refused to abide by the award of an arbitrator." Id. at 216. The Supreme Court affirmed the lower court's denial of fees because lingering doubt existed in the law as to whether a Supreme Court's decision applied or whether it should have been limited to its peculiar factual situation. Id. The Court ruled that the case was not "exceptional." Earlier in its opinion, the Court discussed "exceptional" cases as those involving fraud, oppression,

or bad faith. Id. at 215.

This case does not fall within the rubric of an "exceptional" case such that attorney fees are warranted. The award of costs and attorney fees is an extraordinary measure. Allied Bldg. Prod. Corp. v. Local NO. 247, Int'l Broth. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, 774 F. Supp. 1066, 1075 (E.D. Mich. 1991). PNR appears to have proceeded here on its good faith belief that the CBA conflicts with existing tax law, which is based on its interpretation of a Private Letter Ruling in another case. Although PNR's arguments failed to convince Arbitrator Daniel or this Court that the CBA must be unilaterally modified to comply with federal tax laws, the history of this dispute does not establish that PNR has acted in bad faith, or that its conduct has been unconscionable or fraudulent. However slim PNR's arguments may appear, there is no doubt that PNR acted on the advice of its accountants and lawyers and thus, had a good faith belief that its conduct was warranted under the existing law. For this reason, MNA's motion for attorney fees and costs must be denied.

## CONCLUSION

For the reasons stated above, PNR's motion to vacate the arbitration award (Doc. 3) shall be DENIED and MNA's motion for summary judgment (Doc. 13) hereby is

GRANTED.  The arbitration award is hereby upheld.

SO ORDERED.

Dated:  October 7, 2008

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
October 7, 2008, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk